## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| GREGORY CANNON, | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| v. | )    **Civil Action No. 12-10512-DJC** |
| | ) |
| AETNA LIFE INSURANCE COMPANY | ) |
| et al., | ) |
| | ) |
| **Defendants.** | ) |
_____ )

## MEMORANDUM AND ORDER

**CASPER, J.**                                           **November 23, 2015**

### I.      Introduction

Plaintiff Gregory Cannon ("Cannon") brings this action against the PharMerica Temporary Disability Income Plan (the "Plan") and the Plan's claims fiduciary, Aetna Life Insurance Company ("Aetna") (collectively, the "Defendants"), under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132 *et seq.*, alleging that the Defendants improperly denied Cannon short-term disability benefits. Cannon and the Defendants have each moved for summary judgment. D. 86, 88. For the reasons set forth below, Cannon's motion is DENIED and the Defendants' motion is ALLOWED.

### II.      Factual and Procedural Background

#### A.      The Plan

PharMerica Corp. ("PharMerica") employed Cannon as a pharmacist at a Massachusetts hospital. D. 87 at 4; D. 69, Administrative Record ("AR"), at 1366, 1376, 1408-09; D. 37 ¶ 1. Pharmerica administered the Plan, an ERISA-governed employee welfare benefits plan, in which Cannon, as a Pharmerica employee, participated. D. 37 ¶ 6. Aetna funded the Plan through a

Group Accident and Health Insurance policy (the "Policy") issued to PharMerica and acted as the claims fiduciary with respect to benefit claim determinations.  See D. 22 at Policy 55.  The Policy expressly grants Aetna "complete authority to review all denied claims for benefits" and Aetna retains "discretionary authority to:  determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms" of the Policy. D. 22 at Policy 78; D. 37 ¶ 7.

A Plan participant is entitled to STD benefits if he is "not able, solely because of disease or injury, to perform the material duties of [his] own occupation."  D. 37 ¶ 8.  One's "own occupation" is further described as "the occupation that you are routinely performing when your period of disability begins.  Your occupation will be viewed as it is normally performed in the national economy instead of how it is performed:  for your specific employer; or at your location or work site; and without regard to your specific reporting relationship."  D. 37 ¶ 9.  Under the Plan, STD benefits are payable for a period of 25 weeks, following a seven day waiting period." D. 37 ¶ 11.

**B.     Cannon's Medical History**

On August 3, 2010, Dr. Sam Donta, an infectious disease specialist, examined Cannon, who was seeking medical treatment for exhaustion, pain, occasional swelling in his knees, headaches, dizzy spells, sweats, chills, muscle cramps, occasional burning or itching on parts of his body and nonspecific rashes over his upper chest. AR at 1481.  Dr. Donta opined that Cannon "probably does have chronic [l]yme disease accounting for some, if not all, of his symptoms." AR at 1482.  Based on the probable diagnosis, Dr. Donta recommended additional testing and prescribed Biaxin and Plaquenil.  Id.  Cannon stopped working on August 18, 2010 due to the symptoms associated with the presumptive lyme disease diagnosis.  D. 37 ¶ 14.

On August 25, 2010, Cannon was treated at a hospital emergency room for reported nausea and vomiting which were determined to be a possible reaction to Plaquenil.  D. 37 ¶ 16.  Upon discharge, Cannon was instructed to obtain a new primary care physician and to follow up with a gastroenterologist.  Id.

Cannon returned to the hospital on September 3, 2010 due to nausea and vomiting.  Cannon noted that he had begun seeing his new primary care physician, Dr. David Chiang, as well as a gastroenterologist and a hematologist, all of whom agreed that he should cease taking Plaquenil, which he had resumed pursuant to a recommendation by Dr. Donta.  Id. ¶ 17.

On November 16, 2010, Dr. Donta evaluated Cannon and observed that Cannon "gets sporadic rashes in random areas.  He has ongoing exhaustion, body aches, headaches, concentration issues, and tremors.  Today he is quite tremulous.  He has swelling in his knees, cognitive issues, some auditory hallucinations, and some terrifying dreams."  AR at 2531-32, 2893-94.

On November 18, 2010, Cannon had an appointment with Dr. Chiang's nurse practitioner because he had suffered two falls on the previous day.  D. 89 at 5; AR at 2525.  The nurse practitioner noted that Cannon had an antalgic gait, used a cane and exhibited bruising from the falls, but an x-ray revealed the absence of fractures.  AR at 2526.  On December 1, 2011, Cannon followed up with Dr. Chiang, reporting lightheadedness and falls.  Id. at 2526.  Lab work indicated an electrolyte imbalance.  Id.

On December 3, 2010, Dr. Paul Blachman performed a neurological evaluation of Cannon.  AR at 2517-18.  Blachman noted that Cannon reported an episode of dizziness, loss of balance, and darkening of vision followed by a fall to the floor on the previous night.  Id. at 2517.  Blachman observed a fine motor tremor of the outstretched hand but no focal abnormalities.  Id.

at 2518.  Dr. Blachman opined that the dizziness and falls were likely episodes of syncope and that "[i]t is very likely that because of the profuse vomiting, the patient has become dehydrated, and this has caused drops in blood pressure and syncopal episodes."  Id.

On December 17, 2010, Cannon was evaluated for a fall that had occurred a week earlier. Id. at 2419.  Cannon was sent to the emergency room complaining of chest pain, "palpitations and dyspnea on exertion."  Id. at 1334.  An initial EKG showed atrial fibrillation, which was treated with Diltiazem.  Id. at 1335.  Cannon was admitted to the hospital and repeat studies showed that "[h]e . . . remained in a sinus rhythm [after] admission."  Id. at 1336, 1353.  Dr. Seth McClennen, a cardiologist, evaluated Cannon and determined that Cannon had "a preserved ejection fraction, structurally normal heart, and an episode of paroxysmal atrial fibrillation."  Id. at 1348–49.  A MRI showed "no new findings/abnormalities."  Id. at 1351.  Cannon's admission note mentioned that Cannon "had 11 months of nausea and vomiting."  Id. at 1334.  A gastric emptying study was conducted and "showed delayed emptying, consistent with gastroparesis" for which Reglan was prescribed.  Id. at 1351.  Cannon was discharged on December 20, 2010, with instructions to "[g]radual[ly] [r]eturn to [n]ormal [a]ctivity ([n]o driving (as prior))."  Id. at 1350, 1352.

On January 6, 2011, Cannon had a follow up appointment with Dr. McClennen, his cardiologist.  Id. at 2494-96.  Dr. McClennen noted Cannon's report of fatigue, which he attributed to a side effect of the medication Atenolol.  Id. at 2494.  Dr. McClennen concluded that Cannon had syncope, but not any arrhythmias.  Id. at 2495.

On January 9, 2011, Cannon experienced a recurrence of atrial fibrillation and was treated in the emergency room.  Id. at 2487-93.

On February 1, 2011, Dr. Chiang examined Cannon.  Chiang speculated that Cannon might have sleep apnea and indicated that he would refer Cannon for a sleep study.  Id. at 2483.  Dr. Chiang's notes state "still concerned for neurologic etiology; he has syncope, gastroparesis, +Romberg, and tremor."  Id.  Dr. Chiang further noted that Cannon "reports still falling.  His cardiologist that that it was secondary to the [atrial fibrillation].  His neurologist thought that it was due to orthostatic hypotension."  Id. at 2482.

On February 8, 2011, Dr. Antonio Caro, an infectious disease specialist at Tufts Medical Center, evaluated Cannon and concluded that Cannon did not have and never had lyme disease. Id. at 2478.  The same conclusion was reached by Dr. Kalish, also an infectious disease specialist at Tufts Medical Center, following his evaluation of Cannon on March 9, 2011.  Id. at 3045.  Dr. Kalish speculated that Cannon could have a systemic illness and noted Cannon's neurological symptoms.  Id. at 3047.  Dr. Kalish observed that Cannon "has had gastroparesis and has nausea and vomiting, though this has been better on Reglan, but it did happen again in the examining room today."  Id. at 3045.  Dr. Kalish further noted that Cannon had "dysmetria on finger to nose, left greater than right hand, and has great difficulty with the repetitive hand motion slapping one against the next . . . ."  Id. at 3046.

On March 15, 2011, Cannon saw Dr. Chiang who noted that there was "[s]till no etiology of [Cannon's] symptoms."  Id. at 2471.  On the same day, Dr. Markowitz conducted a neurological evaluation and reported that "[m]otor examination of the upper extremities reveals a slight tremor of the outstretched arms without weakness or ataxia.  However, he does have cogwheel rigidity at both wrists."  Id. at 2469.  Dr. Markowitz further observed that Cannon's "gait is not severely impaired but has a stooped quality with decreased right arm swing and general mild awkwardness.  He is able to walk on his heels and on his toes but clearly has trouble with tandem

gait. He is steady on Romberg testing." Id. at 2469. Dr. Markowitz was of the opinion that "neurologic abnormalities on examination are slight" but that he thought "there is a mild Parkinsonian quality to his examination." Id. at 2470. Dr. Markowitz noted that Cannon and his wife reported "marked fluctuations" in his condition and that "he is more Parkinsonian at other times." Id. Finally, Dr. Markowitz opined that the medication Metoclopramide could be contributing to the Parkinsonian symptoms. Id.

On May 6, 2011, Dr. Chiang completed an Attending Physician Statement ("APS") for Aetna in which he indicated that Cannon had "[n]o ability to work." Id. at 2885. Dr. Chiang stated that Cannon "cannot drive, keeps falling and hurting himself, keeps dropping medication on the floor." Id. Dr. Chiang also noted that Cannon "[k]eeps falling down, cannot safely drive; Atrial fib that keeps breaking through; needs assistance dressing when Parkinsonian breakthrough – cannot operate a keyboard or [illegible]. Keeps dropping meds on floor." Id. at 2884-85.

### C.    Cannon's Claim for Benefits, Termination and Appeal

On August 26, 2010, Cannon filed a claim with Aetna for STD benefits. Id. at 1611. Aetna determined that Cannon became disabled on August 18, 2010 and approved Cannon's claim for benefits from August 25, 2010 to October 3, 2010, based on the probable diagnosis of lyme disease, the emergency room visits and to allow time to conduct a peer review of Cannon's claim. Id. at 1570–71. At Aetna's request, Dr. Rodger Clark, a board-certified physician specializing in infectious disease, reviewed Cannon's medical file. Id. at 1365–68. As part of his review, Dr. Clark conferred with Dr. Donta. Id. at 1367. Based on Dr. Clark's review of the medical records and the consultation with Dr. Donta, Dr. Clark concluded that the evidence "fail[ed] to support functional impairment for the entire time frame." Id. at 1366.

On October 6, 2010, Aetna notified Cannon that his STD benefits were terminated as of October 3, 2010.  Id. at 1651.  Based upon Dr. Clark's review and the underlying medical documentation, Aetna informed Cannon that "there [was] no evidence of a functional impairment which would substantiate an inability to perform [Cannon's] occupation starting from October 4, 2010."  Id.  Aetna advised Cannon of his right to appeal its decision.  Id.

On January 6, 2011, Cannon appealed Aetna's decision to terminate his benefits.  Id. at 1330.  Cannon asserted that he was experiencing continuing symptoms of exhaustion, pain, weight loss, nausea, vomiting, syncope and frequent loss of balance.  Id.  As part of his appeal, Cannon submitted additional medical records, including records of his hospitalization in December 2010.  Id. at 1331.

In the course of its review of the appeal, Aetna retained Dr. Wendy Weinstein, an independent physician specializing in internal medicine, to review Cannon's entire file and issue a report.  Id. at 1321.  Dr. Weinstein issued a report on February 7, 2011.  Id. at 1321–27.  Dr. Weinstein noted that Dr. McClennen recommended that Cannon be seen every six months for routine follow up for atrial fibrillation, but that there was no need for other additional evaluation and treatment.  Id. at 1325.  Dr. Weinstein also stated that Dr. Donta confirmed that Cannon's most recent sereologies report was not definitive for lyme disease and thus did not explain Cannon's symptoms.  Id. at 1324-25.  Dr. Donta did not recommend continuing restrictions or limitations for Cannon.  Dr. Weinstein concluded that Cannon was able to return to work as a pharmacist as of October 4, 2010, except for his hospitalization from December 17 until December 20.  Id. at 1325-26.  Dr. Weinstein stated, however, that "additional clinical documentation" could be helpful in evaluating Cannon's claimed impairment, including "other progress notes from the timeframe in question."  Id. at 1327.  Dr. Weinstein explained that

"[n]one of the records from [Cannon's] primary care provider, Dr. Chiang, have been presented for review and these records would be beneficial." Id.  In addition, "Dr. Donta indicated that he recommended [Cannon] have a neurologic evaluation after [Cannon] was seen on 11/16/10. [Cannon] did have a neurologic consultation during his hospitalization on 12/18/10, but any other neurologic evaluations would be relevant for review as well." Id.

On February 18, 2011, Aetna notified Cannon that it had completed its review of his appeal and that "the original decision to terminate TDI benefits, effective 10/4/10, has been partially overturned." Id. at 1657.  Aetna informed Cannon of the medical documents reviewed on appeal, including the physician notes from Cannon's hospitalizations, imaging reports and Dr. Donta's August 2010 APS, but no records from Dr. Chiang. Id.  Aetna partially upheld its initial determination, with the exception of granting benefits during Cannon's hospitalization from December 17, 2010 through December 20, 2010. Id.  Aetna advised Cannon that its review was final and that if Cannon disagreed with the claim determination he had the right to take legal action under ERISA. Id.

### D.    Procedural History

On March 21, 2012, Cannon filed the instant complaint, alleging that he is entitled to STD benefits.  Compl., D. 1 ¶ 2.[1]  On February 26, 2013, Cannon and the Defendants cross-moved for summary judgment.  D. 36, 39.  One of the arguments asserted by Cannon was that "Aetna's failure to evaluate [his] symptoms in light of the occupational demands of his own occupation as a pharmacist was arbitrary and capricious."  D. 40 at 12; D. 52 at 22.  The Court

---

[1]Cannon had also sought long-term disability benefits, but, on February 18, 2013, the parties jointly stipulated to dismissal of that claim without prejudice.  D. 35.  Cannon subsequently filed a new action seeking long-term disability benefits, Civ. Action No. 14-cv-12546, which is stayed pending the resolution of the summary judgment motions in the present case.  D. 15, 32, Civ. Action. No. 14-cv-12546.

rejected this argument, reasoning that both reviewing physicians "were aware of the demands of Cannon's job when conducting their review and analysis." D. 52 at 23. Because neither physician identified evidence of any need for restrictions or limitations to Cannon's medium occupation from the medical record, the Court concluded that a vocational review was not needed. Id. at 23-24.

Based on Dr. Weinstein's statement that the medical records she reviewed were incomplete because they did not include records from Dr. Chiang and from any additional neurological evaluations, the Court further concluded that a "[l]imited remand to Aetna is appropriate given Dr. Weinstein's recommendation as to the absence of these records, particularly Dr. Chiang's records." Id. at 15. "[T]o ensure Cannon has been provided a full and fair review of his full medical record," the Court ordered the matter remanded to Aetna "to allow the independent reviewing physicians, including Dr. Weinstein, to update their reports after the record is supplemented with the additional medical records identified in Dr. Weinstein's February 7, 2011 report, including the records from Cannon's primary care physician, Dr. Chiang." Id. at 24. Accordingly, on September 17, 2013, the Court allowed Cannon's motion in part and denied the Defendants' motion. Id.

Following remand, Cannon supplemented the record. Among the additional records submitted for Aetna's review were affidavits from Canon and his wife, id. at 3239-42; Dr. Chiang's APS dated May 6, 2011, id. 2885; and a notification from the Social Security Administration ("SSA") that Cannon was eligible for Social Security Disability Benefits ("SSDI") as of August 2010, id. at 2234.

   *1.    Dr. Weinstein's Reports*

Dr. Weinstein reviewed the supplemented record and provided an additional report on November 18, 2013.  D. 87 at 9; AR at 2414-27.  Dr. Weinstein noted that the additional records "document multiple evaluations for subjective complaints of nausea and vomiting and frequent falls."  AR at 2416.  While there was no evidence of lyme disease, laboratory studies indicated:

> "abnormal liver function studies and chronic anemia.  These findings were noted to be consistent with alcohol use but the claimant denied excessive alcohol consumption.  He went on to have a seizure which was documented to possibly be an alcohol-withdrawal seizure as his alcohol level at the time of that hospitalization was zero.  The records continued to document an increased level of transaminases with a ratio of the AST over the ALT that is consistent with alcohol use.  Therefore, although the claimant continued to deny excessive alcohol use, a number of his laboratory derangements, physical examination findings, and medical presentations could be explained by alcohol use."

Id. at 2416.  Dr. Weinstein noted that Cannon was seen by a gastroenterologist during his June 2011 hospitalization because of the abnormal liver function studies.  She stated that Cannon:

> "again indicated that he drank two or at most four alcoholic beverages per week.  This question is constantly being asked to the claimant as his liver function abnormalities and other findings can be explained by alcohol use.  At this point, the claimant stated he had never been a heavy drinker whereas he subsequently referenced in October 2011 a history of drinking enormous amounts of alcohol in college."

Id. at 2421.  Dr. Weinstein determined that "[t]he presented clinical information fails to support functional impairments that would preclude the claimant from performing his medium occupation from 12/21/10 to 10/5/11 other than the dates of his hospitalization."  Id. at 2424.  The initially cited reason for STD benefits was lyme disease, but there was no evidence that Cannon ever suffered from lyme disease.  Id.  Dr. Weinstein dismissed Cannon's "subjective complaints of nausea, vomiting, weight loss and episodes of dizziness leading to falls" because "the records have not documented persistently abnormal physical examination findings or laboratory studies that would support functional impairments from the claimant's medium

occupation other than his dates of hospitalization." Id.  Dr. Weinstein attributed these symptoms to excessive alcohol use:

> "The claimant had multiple evaluations for abnormal liver function studies.  There was repetitive discussion of these laboratory studies with increased AST/ALT ratio being consistent with alcohol use.  The claimant was inconsistent in his acknowledgement of his alcohol use.  In 2009 when he had increased liver function studies he indicated he was drinking one to two glasses of wine daily. . . .  The claimant again noted in February 2010 that he drank on a daily basis. . . .  After being questioned about his alcohol use, the claimant began to indicate he only drank four to five times a week.  He then noted drinking one to two ounces per week.  However, the majority of the claimant's medical problems can be explained by alcohol use.  The elevated transaminases with an episode of increased pancreatic enzymes could be related to alcoholic hepatitis and pancreatitis. . . .  It was stated that he did not meet the typical criteria for NASH (nonalchoholic [sic] steatohepatitis) with the gastroenterologist and other provider's [sic] continuing to question the claimant's alcohol use."

Id. at 2424.  Dr. Weinstein conceded that Cannon tested positive for alcohol only once, on August 24, 2011, but opined that his symptoms and abnormal test results "could still be related to alcohol use with abstinence due to symptoms prior to the evaluations."  Id.  In addition, Dr. Weinstein stated that Cannon's episodes of atrial fibrillation could be instances of "holiday heart syndrome," or rhythm disturbances brought on by alcohol use.  Id. at 2525.  Although Cannon consistently denied excessive alcohol consumption, Dr. Weinstein noted a reference to Cannon experiencing alcohol withdrawal seizures and admitting regular consumption.  Id. at 2424.  She further noted that Cannon tested positive for marijuana use on one toxicology screen.  Id.  She concluded that "[r]egardless of the claimant's self-report of his alcohol use, the records strongly suggest regular significant alcohol use causing his metabolic abnormalities."  Id.

Dr. Weinstein provided another report, date January 27, 2014, after Cannon's counsel requested review encompassing the period beginning October 4, 2010.  Id. at 2381-85.  In that report, Dr. Weinstein reviews more of Cannon's medical history and echoes her conclusion that "the records do not document other persistently abnormal examination findings or complications

from the claimant's subjective complaints [other than his hospitalization beginning on December 17, 2010 and an emergency room evaluation and treatment on January 9, 2011] that would preclude him from performing his medium occupation during the remainder of the time frame." Id. at 2383.   She did not pursue a peer to peer consultation with Dr. Chiang, but provided an assessment of his APS, stating in part that the episodes of atrial fibrillation did not require further evaluation or treatment and Dr. McClennen did not recommend restrictions or limitations.   Id. at 2383, 2384.   In addition, the initial diagnosis of lyme disease had been "refuted by multiple specialists;" "there was no indication of persistently abnormal neurologic examination findings or the need for work restrictions and limitations based on the claimant's neurologic history;" and there was no evidence of multiple sclerosis. Id. at 2384.

2.      <em>Dr. Brusch's Reports</em>

Because Dr. Clark was not available to update his report, Aetna obtained a new independent physician, Dr. John Brusch, to conduct a review of the complete administrative record.   See id. at 2343.   Dr. Brusch's November 20, 2013 report briefly summarized a few entries from Cannon's medical history and observed that Cannon suffered from fatigue, "dizziness, unsteady gait, paresthesias in upper and lower extremities, poor concentration, and somnolence," then stated his conclusion that "[b]ased on the provided documentation, the claimant does not have functional impairments from 12/21/2010 through 10/31/2011 that would preclude him from his own medium level occupation."   Id. at 2430-31.   Dr. Brusch focused heavily on the disproved initial lyme disease diagnosis. E.g., id. 2431 (noting that "[o]n the basis of his reported lyme disease, Mr. Cannon has no functional limitations"); id. at 2432 (concluding that "[i]n summary, the diagnosis of lyme disease in this claimant is made purely on the basis of symptomatology and not on the clinical evidence").   Dr. Brusch explicitly stated that his opinion

12

was based on the lack of evidence supporting a lyme disease diagnosis: "[f]rom the perspective of an infectious disease specialist focusing on the significance of [l]yme disease in this claimant's functionality, the claimant can return to his previous medium level occupation as a clinical pharmacist.  I base this opinion on the fact that this claimant does not have [l]yme disease and so should not have any change in his ability to perform his job due to [l]yme disease on the basis of the effects of [l]yme disease."  Id. at 2432.

Based on the refuted lyme diagnosis, Dr. Brusch also rejected Dr. Chiang's conclusion in his APS that Cannon could not work.  Id.  The discussion of Chiang's APS merely noted Dr. Chiang's primary diagnoses of "[l]yme arthritis, atrial fibrillation and Parkinson's disease as well as multiple sclerosis" and stated that "[o]n the basis of the diagnosis of [l]yme disease, these restrictions and limitations are not supported by the medical evidence submitted."  Id. at 2433.

Like Dr. Weinstein, Dr. Brusch provided another report, dated January 28, 2014, accounting for the longer time frame urged by Cannon.  Id. at 2389-92.  Dr. Brusch acknowledged that Cannon continued to have "fatigue[,] dizziness, unsteady gait, paresthesias, and somnolence," id. at 2390, and reiterated his conclusion that Cannon did not have functional impairments caused by lyme disease.  Id. at 2390-91.  Dr. Brusch again described Dr. Chiang's APS, but did not explain why Dr. Brusch rejected Dr. Chiang's conclusion that Cannon could not work.  Id. at 2391.

### 3.    Notification of Remand Review and Aftermath

On December 12, 2013, Aetna informed Cannon that its remand review was complete and that the termination of Cannon's STD benefits had been upheld.  Id. at 2339-43.  The letter indicated that Dr. Brusch and Dr. Weinstein concluded that the medical documentation did not demonstrate an impairment that precluded Cannon from performing his own occupation as of

December 21, 2010, the day following his discharge from the hospital.  Id. at 2340, 2343.  Aetna additionally stated that the medical records did not demonstrate that he had lyme disease and that his one episode of atrial fibrillation was not indicative of any heart abnormality.  Id. at 2340-43. Finally, Aetna reiterated Dr. Weinstein's conclusion that Cannon's self-reported symptoms of nausea, vomiting, weight loss and dizziness may have been the result of excessive alcohol use or alcohol withdrawal.  Id.

Aetna did determine, however, that Cannon was unable to perform his own occupation from June 9 through June 25, 2011 and from October 5 through October 31, 2011 due to hospitalization for alcohol abuse and withdrawal symptoms.  Id. at 2342-43.  But Aetna noted that those two time periods were after the expiration of the maximum STD benefits period, which concluded on February 16, 2011,[2] and that Cannon was also ineligible for benefits at those times because he ceased active employment on October 4, 2010.  Id. at 2343.

Upon reviewing Aetna's determination, Cannon's attorney requested that the remand review include the time period beginning on October 4, 2010, rather than December 21, 2010. D. 87 at 11.  In response, Aetna asked both reviewing physicians to reevaluate the medical records beginning with the earlier commencement date.  Id.  They issued additional reports, discussed above.

On February 18, 2014, Aetna completed its additional remand review of the record and reiterated its determination that Cannon was not entitled to any further STD benefits.  AR at 3295-3302.  On July 1, 2014, the parties moved to reopen this matter and informed the Court that Aetna had completed its review and upheld its denial of benefits.  D. 61.  The Court granted the

---

[2] The Defendants' brief states that the maximum STD benefits period ended on April 30, 2011, D. 87 at 11, while Cannon's brief cites a date of February 16, 2011, D. 89 at 3.  In a subsequent brief, the Defendants acknowledged that the February date is accurate.  D. 97 at 6 n.1.

motion on July 9, 2014.  D. 62.  On October 8, 2014, Aetna filed the administrative remand record under seal.  D. 68.  The Defendants have now moved for summary judgment following remand.  D. 86.  Cannon filed his motion for summary judgment shortly thereafter.  D. 88.  The Court heard the parties on the motions and took these matters under advisement.  D. 109.

## III.   Discussion

### A.   Standard of Review

Because the Plan grants Aetna discretionary authority to determine whether Cannon is eligible for benefits, its decision to deny benefits will stand unless it was an abuse of discretion. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 107, 115 (1989); Colby v. Union Security Ins. Co., 705 F.3d 58, 61 (1st Cir. 2013); Medina v. Metropolitan Life Ins. Co., 588 F.3d 41, 45 (1st Cir. 2009); Gannon v. Metropolitan Life. Ins., 360 F.3d 211, 213 (1st Cir. 2004).  "In the ERISA context, this metric is equivalent to the familiar arbitrary and capricious standard." Colby, 705 F.3d at 61.  "In other words, the administrator's decision must be upheld if it is reasoned and supported by substantial evidence."  Gannon, 360 F.3d at 213.  "Evidence is substantial it is reasonably sufficient to support a conclusion, and the existence of contrary evidence does not, in itself, make the administrator's decision arbitrary."  Id.  Aetna's determination must be "plausible in light of the record as a whole."  Colby, 705 F.3d at 61 (quoting Leahy v. Raytheon Co., 315 F.3d 11, 17 (1st Cir. 2002)).  The role of the Court is not to determine which determination is correct, but "whether the insurer had substantial evidentiary grounds for a reasonable decision in its favor."  Gannon, 360 F.3d at 216 (quoting Matias-Correa 345 F.3d 7, 12) (1st Cir. 2003)).  "In order to withstand scrutiny, the plan administrator's determinations must be 'reasoned and supported by substantial evidence.'  In short, they must be reasonable."  Colby, 705 F.3d at 62 (quoting D & H Therapy Assoc. v. Boston Mutual Life Ins.

Co., 640 F.3d 27, 35 (1st Cir. 2011)).  Where the record contains conflicting evidence, "it is entirely appropriate for a reviewing court to uphold the decision of the entity entitled to exercise its discretion."  Gannon, 360 F.3d 211 at 216.

**B.    Dr. Weinstein and Dr. Brusch's Independent Medical Examination Reports**

Cannon argues that Aetna failed to credit medical evidence of his significant functional limitations due his persistent symptoms of tremors, nausea and vomiting, and falls and gait disturbances.  D. 89 at 15-17.  According to Cannon, Aetna unreasonably focused on the lack of definitive diagnosis rather than the disabling effects of his symptoms.  Id. at 15, 17.  In addition, Cannon asserts that Aetna "summarily dismissed Dr. Chiang's opinion of Mr. Cannon's functional limitations."  D. 97 at 7.

Four evidentiary areas are at the core of this dispute.  First, Aetna relied upon the reports of Dr. Weinstein, who rendered an assessment prior to remand, then updated her report twice after the record was augmented with Dr. Chiang's and other records.  Second, Aetna relied upon Dr. Brusch's two reports, both submitted following remand, after Dr. Clark became unavailable.  Third, Cannon points to a letter from the SSA granting him disability benefits.  D. 89 at 21-23.  Fourth, Cannon raises Aetna's own internal policies guiding the determination of claims.  Id. at 19.

Upon review of each of these evidentiary areas, the Court concludes that, taken as whole, Aetna's determination was not arbitrary and capricious.  Dr. Weinstein's report provided reasonably sufficient support for denying Cannon's claimed benefits, even if Dr. Brusch's report was lacking in some respects, discussed below.  The mere fact that Cannon received SSDI benefits does not compel Aetna to make a similar award, nor does the record contain evidence of the claim presented by Cannon or SSA's reasoning in allowing it, providing little for Aetna's

consideration.  In addition, Aetna's failure to follow its own internal guidelines does not provide a legal right to Cannon nor was it an explicit requirement of the Court's remand order.

1.      *Dr. Weinstein's Report of January 27, 2014*

The Court concludes that Dr. Weinstein's two post-remand reports are "reasoned and supported by substantial evidence."  Gannon, 360 F.3d at 213.  Contrary to Cannon's assertion, both reports address Cannon's symptoms and conclude that the record did not demonstrate impairments serious enough to render Cannon disabled.  For example, in her discussion of Cannon's medical history, Dr. Weinstein noted that when Cannon consulted with Dr. Donta in November 2010, he was "tremulous."   AR at 2381.   She also reported Dr. Blachmun's observation that Cannon had a "fine tremor on outstretched hands but there were no other examination abnormalities documented."   Id. at 2382.   The fine tremor was again observed during a follow up with an unnamed doctor in February 2011.  Id.  Dr. Markowitz, a neurologist, was also referenced by Dr. Weinstein, along with Dr. Markowitz's record of Cannon's stated "history of unsteady gait with of occasional falling since the summer of 2010."  Id. at 2383.  Dr. Markowitz himself observed that Cannon "was at his neurological best with relatively good gait, tremor, and handwriting."  Id.  Dr. Weinstein further provided Dr. Markowitz's observation that Cannon's "gait was not severely impaired but he had a stooped quality with decreased right arm swing and general mild awkwardness."   Id.   Dr. Weinstein's report explained that "Dr. Markowitz concluded that the neurologic examination abnormalities were mild but there could be [a] mild Parkinson quality to the exam."  Id.

From these records, Dr. Weinstein reasonably concluded that, other than Cannon's hospitalizations, the records did not document "persistently abnormal examination findings or complications from the claimant's subjective complaints that would preclude him from

performing his medium [duty] occupation during the remainder of the time frame." Id.; see id. at 2384. Dr. Weinstein specifically mentioned Cannon's falls, but reasoned that they were "intermittent" and that there was no documentation of "persistently abnormal neurologic examination findings" precluding Cannon from performing his job. Id.

Dr. Weinstein also confronted Dr. Chiang's APS, which concluded that Cannon was not able to work, noting Dr. Chiang's diagnoses of atrial fibrillation, lyme disease, Parkinson's disease and multiple sclerosis. Id. at 2384. Dr. Weinstein reviewed the record, which refutes each diagnosis, and concluded that the records did not support "the need for restrictions and limitations." Id. Finally, Dr. Weinstein acknowledged that Cannon's subjective complaints resulted in adjustment of his medications, but that "there is no documentation that the adverse effects would cause functional impairments from the claimant's medium occupation." Id.

### 2. Dr. Weinstein's Report of November 19, 2013

Dr. Weinstein's report dated November 19, 2013 provided further analysis of Cannon's subjective symptoms and bolstered her conclusion that Cannon was able to return to his job. Dr. Weinstein stated that the medical records "document multiple evaluations for subjective complaints of nausea and vomiting and frequent falls." AR at 2416. The medical record, however, indicated that the "laboratory derangements, physical examination findings, and medical presentations could be explained by alcohol use." Id. Dr. Weinstein cites abnormal liver function studies, chronic anemia and a seizure possibly related to alcohol withdrawal as consistent with her hypothesis. Id.

Several times Dr. Weinstein again noted Cannon's reported or observed symptoms and concluded that physical examinations did not document abnormalities or impairments that would preclude Cannon from returning to his job. For example, prior to the STD benefits period,

Cannon was seen by a doctor because of nausea and vomiting, and Cannon exhibited dizziness, short-term memory loss and tremor.  Id. at 2416.  The doctor's examination, however, did not result in the documentation of any issues "other than intention tremor with normal muscle strength."  Id.

Dr. Weinstein's conclusion that Cannon's symptoms could be the result of alcohol use is supported by substantial evidence cited throughout her report.  She noted the results of at least two tests indicative of alcohol dependency, "liver function" and "AST to ALT levels," before the beginning of the STD period.  Id. at 2417.  Records from August 2010, Dr. Weinstein observed, revealed "an elevation of the mean corpuscular volume which can be related to alcohol use . . . ." Id.  Dr. Weinstein mentioned an "increased AST and bilirubin on liver function studies" from documentation from September 2010.  Id.  Dr. Sampson saw Cannon for a gastrointestinal evaluation in September 2010, and Dr. Weinstein indicated that the "[e]xam did not document abnormalities."  Id. at 2418.  Dr. Sampson, however, documented Cannon's abnormal liver function studies and "indicate[d] that there was a long history of these abnormalities."  Id.  Dr. Weinstein repeated Dr. Sampson's observation that Cannon's laboratory test results "were 'all suggestive of excessive alcohol use.'"  Id.  Dr. Weinstein wrote that Dr. Caro, an infectious disease specialist whom Cannon consulted regarding lyme disease, opined that Cannon's fatty liver was "possibly . . . associated with alcohol use which the claimant denied."  Id. at 2419-20. Dr. Weinstein noted an "increased AST/ALT ratio" again in laboratory studies completed in May 2011, after the conclusion of the STD period, id. at 2420, and that Cannon displayed "liver function abnormalities" in June 2011 which "again documented findings consistent with alcohol use."  Id. at 2421.  Dr. Weinstein reported Dr. Ellerin's June 2011 impression that "question alcohol-related neurologic disease, although the claimant denies it."  Id.  In October 2011, Dr.

Weinstein wrote, Cannon "was started on alcohol withdrawal protocol" and was evaluated for alcohol dependence during a hospitalization, but that there "were no acute signs of alcohol withdrawal." Id. at 2422.  The hospital discharge indicated "likely alcoholic liver disease." Id. at 2423.

Based on this substantial evidence, Dr. Weinstein reasonably surmised that "the majority of the claimant's medical problems can be explained by alcohol use." Id. at 2424.  Dr. Weinstein attributed "negative alcohol levels when in the hospital" to "abstinence due to symptoms prior to the evaluations." Id.  She asserted that "[r]egardless of the claimant's self-report of his alcohol use, the records strongly suggest regular significant alcohol use causing his metabolic abnormalities. . . .  However, other than the dates of hospitalization, there is no documentation that the claimant would have been unable to perform his medium occupation until he had the seizure on 10/5/11." Id. at 2424-25.

Dr. Weinstein also provided analysis of Dr. Chiang's and other records, the purpose of the Court's remand.  The report stated that Dr. Chiang's records showed that Plaquenil could have caused Cannon's vomiting and nausea, but that no "examination abnormalities" were documented on Cannon's September 2010 consultation with Dr. Chiang.  Id. at 2417.  Dr. Weinstein indicated that Cannon saw Dr. Chiang at least twice in 2010 because of falls, and that Cannon was evaluated by Dr. Blachmun, who reviewed Cannon's history of falls.  Id. at 2418. Other than the tremor, however, neither Dr. Chiang nor Dr. Blachmun documented any abnormalities.  Id.

Dr. Weinstein acknowledged Cannon's complaints, mentioned in his letter, of vomiting, which prevented him from being near sterile medications, and tremors, id. at 2420-21, but concluded that "the records have not documented persistently abnormal physical examination

findings or laboratory studies that would support functional impairments from the claimant's medium occupation other than his dates of hospitalization." Id. at 2424. Dr. Weinstein made a similar conclusion with respect to falls:

> The records document the claimant having intermittent unsteady gait and episodes of falls. However, when he was evaluated by the treating providers he was not noted to have consistently abnormal gait problems or musculoskeletal and neurologic examination abnormalities. There is reference to him intermittently using a cane to increase his balance but there is no documentation that he would have been unable to perform his medium occupation based on this problem. Id. at 2426.

Finally, Dr. Weinstein concluded that the records did not document an impact on Cannon's ability to work from adverse effects of medication. Id.

### 3.    Dr. Brusch's Reports

Dr. Weinstein's report, standing alone, provided a reasonable basis for termination of Cannon's claim for STD benefits. Like Dr. Weinstein, Dr. Brusch, in his report dated January 28, 2014,[3] acknowledged some of Cannon's symptoms, including falls and unsteady gait, AR at 2390, but Dr. Brusch's analysis focused almost exclusively on the disproved lyme disease diagnosis, without reference to most of the other record evidence. For example, Dr. Brusch opined that "the claimant does not have functional impairments . . . in regards to [l]yme disease." Id. Elsewhere in his report Dr. Brusch similarly stated that "[o]n the basis of [l]yme disease, the claimant should be able to perform his previous occupation . . . since there is no evidence of any impairment due to [l]yme disease and its side effects." Id. at 2391 (also stating that "[f]rom the perspective of an infectious disease specialist focusing on the significance of [l]yme disease in this claimant's functionality, the claimant can return to his previous . . . occupation"). Dr.

---

[3] Dr. Brusch's earlier report, dated November 20, 2013, is the same in all respects relevant to the Court's discussion. AR at 2429-34.

Brusch explicitly excluded any reported issues other than lyme disease, stating that "[t]his opinion does not take into account any other medical, neurological and/or behavioral health issues that the claimant may have." Id.

Despite the limitations of Dr. Brusch's report, however, Dr. Weinstein's report provided a reasoned explanation for the Aetna's denial.  Moreover, Cannon failed to meet his obligation to produce objective evidence that he was unable to perform his own occupation.  Cannon points to subjective and objective reports of his symptoms, AR 3239-40 (Cannon's affidavit); AR 3241-42, D. 89-1 (Mrs. Cannon's affidavit); D. 89 at 15-16, but he fails to affirmatively point to a medical determination, other than Dr. Chiang's APS, that his symptoms prevented him from performing his own occupation.  No doctor besides Dr. Chiang recommended any limitations.  See Denmark v. Liberty Life Assurance Co. of Boston, 481 F.3d 16, 37 (1st Cir. 2007), vacated on other grounds, 566 F.3d 16, 37 (1st Cir. 2007) (stating that "this court draws a distinction between requiring objective evidence of the diagnosis, which is impermissible for a condition such as fibromyalgia that does not lend itself to objective verification, and requiring objective evidence that the plaintiff is unable to work, which is allowed").  As the Court noted in its previous opinion, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).

Gaylor v. John Hancock Mutual Life Ins. Co., 112 F.3d 460, 467 (10th Cir. 1997), cited by Cannon, D. 89 at 14, presents a distinguishable scenario.  The insurer in that case had denied the plaintiff's claim because her "condition could not be verified by the use of clinical and

laboratory diagnostic techniques." Id. (internal quotation marks omitted).  Although the etiology of the plaintiff's condition was uncertain, two doctors agreed, based on their physical examinations, that she was afflicted with a disabling condition.  Id.  Cannon does not point to similar evidence in this case, a defect identified by Dr. Weinstein.  AR at 2383-84.  It is reasonable for the lack of an etiology for Cannon's ailments to factor into Dr. Weinstein and Dr. Brusch's analyses because Cannon originally sought STD benefits on the basis of Dr. Donta's lyme disease diagnosis and because Dr. Chiang's APS explicitly presented four diagnoses:  lyme disease, atrial fibrillation, Parkinson's disease and multiple sclerosis.  Dr. Weinstein undertook the further step of examining the record for evidence of a disabling condition based upon Cannon's doctors' physical examinations.  The record, as summarized by Dr. Weinstein, reflects Cannon's complaints of nausea, vomiting, tremors and unsteady gait and doctors' observations of the same.  But no doctor, other than Dr. Chiang, concluded that these symptoms were so severe or disabling that they impaired Cannon's ability to perform his own occupation.  The Court thus concludes that Aetna's termination of Cannon's STD benefits was supported by substantial evidence.

### C.     SSA Award

Cannon argues that it was arbitrary and capricious for Aetna to fail to consider the SSA's award of SSDI benefits.  D. 89 at 21-25.  The SSA's determination, while relevant to an insurer's determination of a claim for disability benefits, is not binding on the insurer.  Gannon, 360 F.3d at 215.  Cannon cites Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 118 (2008), and Pari-Fasano v. ITT Hartford Life & Acc. Ins. Co., 230 F.3d 415, 420 (1st Cir. 2000), to argue that "the SSA decision in this case should be given 'controlling weight'" because "the statutory criteria employed by the SSA are more rigorous than the standard applied by Aetna."  D. 89 at 23

(also citing <u>U.S. ex rel. Loughren v. Unum Group</u>, 613 F.3d 300, 303-04 (1st Cir. 2010)).  The Court cannot conclude that this is the "rare case" where an identical comparison of the statutory and plan criteria indicates that the SSA decision must be accorded controlling weight, <u>Petrone v. Long Term Disability Income Plan for Choices Eligible Employees of Johnson & Johnson & Affiliated Cos.</u>, 935 F. Supp. 2d 278, 295 (D. Mass. 2013), particularly where the fact of the SSDI award of benefits is contained in the record, but not any documentation of the claim made and the reasoning employed by the SSA.  The Court concludes that it was not arbitrary and capricious for Aetna not to consider the SSDI benefits award.

### D. Aetna's Internal Guidelines

Cannon argues that Aetna did not follow its own internal guideline instructing its staff to relay the reviewing physicians' contradictory determinations to Dr. Chiang and solicit his response. D. 89 at 19-20.  Aetna's claim manual provides that if "the IME . . . disagrees with the level of the claimant's functionality, the DMB or Clinical Consultant will provide a copy of the IME to the AP, and ask the AP(s):  [t]o review the IME . . . and advise which areas of the report the AP(s) agrees with[;] and which aspect of the report the AP(s) disagree with, and . . . to provide the clinical basis for their disagreement." D. 89 Exh. B.  Aetna did not ask Dr. Chiang, Cannon's attending physician, to review Dr. Weinstein and Dr. Brusch's IME reports and obtain his assessment of areas of agreement and disagreement.

Aetna's guidelines do not provide any legal right to Cannon or impose any legal duty on Aetna.  <u>Martin v. Polaroid Corp. Long Term Disability Plan</u>, No. Civ. A. 03-11507-RGS, 2004 WL 1305661, at *2 (citing <u>Doe v. Travelers Ins. Co.</u>, 167 F.3d 53, 60 (1st Cir. 1999)). Moreover, the scope of the Court's remand did not explicitly require a peer-to-peer consultation between Dr. Chiang and the independent reviewing physicians.  The Court's Order provided a

"remand to allow the independent, reviewing physicians, including Dr. Weinstein, to update their reports after the record is supplemented with the additional medical records identified in Dr. Weinstein's February 7, 2011 report, including records from Cannon's primary care physician, Dr. Chiang." D. 52 at 16, 24. That was the extent of the action required by Aetna in this case; the Court did not require Aetna to reopen the administrative proceeding beyond the requested updated reports.[4]

In summary, the burden falls on Cannon to show he was entitled to STD benefits, a burden that he has not met here. Dr. Chiang's APS and the SSA determination letter both provide some supporting evidence, but Aetna need not defer to Dr. Chiang as Cannon's treating physician, Black & Decker, 538 U.S. at 834, and the SSA's eligibility determination did not bind Aetna, Pari-Fasano, 230 F.3d at 420, and is devoid of the context and reasoning needed to inform Aetna's determination. Cannon does not point to substantial evidence in the medical record that his symptoms impaired him to an extent that he was unable to perform his own occupation. Aetna's determination, therefore, was not an abuse of discretion.

## IV.     Conclusion

For the foregoing reasons, the Defendants' motion for summary judgment, D. 86, is ALLOWED and Cannon's motion for summary judgment, D. 88, is DENIED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge

---

[4]Cannon renews his argument that Aetna abused its discretion by not reconciling his physical limitations with his own occupation as a hospital pharmacist. D. 89 at 17-19. This argument was previously rejected by the Court. D. 52 at 22-24. Then as now, the reviewing physicians were "aware of the demands of Cannon's job when conducting their review and analysis," id. at 23, when they concluded that there was no evidence for the need for any restrictions or limitations on Cannon's occupation. AR at 2381, 2383-84, 2431-32.